# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Richard S. Kemonou, | Case No. 24-CV-4029 (JMB/JFD) |
| Plaintiff, | |
| v. | **ORDER** |
| Minnesota Department of Revenue, | |
| Defendant. | |

This matter is before the Court on Plaintiff Mr. Richard Kemonou's Motion to Disqualify Magistrate Judge (Dkt. No. 164). Mr. Kemonou asked for the same relief in a letter dated July 8, 2026 (Dkt. No. 162). The Court denied Mr. Kemonou's letter request the same day it was received (July 8, 2026 Order, Dkt. No. 163) and now denies his motion. Mr. Kemonou persists in his belief that this Court is biased against him based on statements the Court made expressing disapproval of Mr. Kemonou's behavior in this litigation, both toward opposing counsel and toward witnesses. The Court again finds that Mr. Kemonou has identified no basis in law or fact to support his motion, and the undersigned therefore declines to disqualify himself from this case.

## I.   Legal Standard

Mr. Kemonou correctly identifies 28 U.S.C. § 455 as the statute controlling his motion. Specifically, he claims that Section 455(a) and Section 455(b)(1) require the Court's recusal. The statute's general provision states that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. §

455(a). Section 455(b) describes specific situations which require recusal *per se*. One of those situations is where a judge "has a personal bias or prejudice concerning a party." 28 U.S.C. § 455(b)(1).

> In reviewing Section 455, the Supreme Court has held that:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Liteky v. United States*, 510 U.S. 540, 555 (1994). The parties agree that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id*.

"A party introducing a motion to recuse carries a heavy burden of proof; a judge is presumed to be impartial and the party seeking disqualification bears the substantial burden of proving otherwise." *United States v. Ali*, 799 F.3d 1008, 1017 (8th Cir. 2015) (citations omitted); *see also United States v. Roads*, 97 F.4th 1133, 1136 (8th Cir. 2024) ("Because a judge is presumed to be impartial, a party seeking recusal bears the substantial burden of proving otherwise.").

## II.    Discussion

Mr. Kemonou raises four grounds as purported support for his claim that the Court must recuse from this case, but none of the four, separately or together, provide the degree of support required for his motion to be granted.

### A. Plaintiff's Perception that the Court Attributed an Improper Motive to His Case

First, Mr. Kemonou claims that in the April 7, 2026 Hearing, the Court "attributed a personal and improper motive" to him when "the Court stated, in substance, that Plaintiff's dismissal from employment caused him to become resentful and motivated him to pursue this litigation." (Pl.'s Mem. in Supp. 3, Dkt. No. 166.) The Court assumes that Mr. Kemonou refers to the point in the hearing where the Court said,

> Mr. Kemonou, I will put it to you bluntly. I do not believe that you are bringing this lawsuit in order to recoup damages for something that was wrong done to you. You are bringing this lawsuit in order to inflict emotional pain and expense upon the Department of Revenue, an organization at which you have developed a deep anger, perhaps informed by your prejudice against people who are Jewish.

(Apr. 7, 2026 Hr'g Tr. 24:13–20, Dkt. No. 148.) The Court made this statement after describing statements made by Mr. Kemonou in documents on the record before the Court. The Court's remarks were therefore not based on a source outside the case record but were based on "facts introduced or events occurring in the course of the current proceedings." *Liteky*, 510 U.S. at 555. Nor did the Court's remarks derive from such a deep-seated antagonism that fairness would be impossible.

The documents which the Court reviewed were extracts from deposition transcripts and an email to counsel for the Department of Revenue. The documents contained statements that reflected Mr. Kemonou's repeatedly stated perception that a conspiracy of Jewish employees and managers at the Minnesota Department of Revenue was taking concerted action to frame him for sexual misconduct, deprive him of employment, harass him, and stalk him. The documents showed Mr. Kemonou asking deposition witnesses

whether they were Jewish. These deposition witnesses included the four women who had complained that Mr. Kemonou had sexually harassed them. The depositions were noticed by Mr. Kemonou, and when asked by the State whether he would agree to take the depositions in written form to lessen the stress on the witnesses, Mr. Kemonou refused. (*See* Dec. 1, 2025 Mem. 2, Dkt. No. 108.) Another document before the Court was an email from Mr. Kemonou to opposing counsel, which contained the statement "It seems Adolf Hitler was right about what he said about you people." (Mar. 20, 2026 Veit-Carter Decl., Ex. D, Dkt. No. 126-1 at 137.) The Court has seen no evidence in this case to so much as suggest that any of Mr. Kemonou's claims are supported by fact. Notably, the very evidence that Mr. Kemonou claims to exist was itself the subject of the motion to compel at issue in the April 7 hearing because Mr. Kemonou refused to produce that evidence. It is clear from the context of the hearing that the Court's statements were about Mr. Kemonou's unsupported conspiracy theories about a secret Jewish cabal out to harm him,[1] rather than about the racial discrimination he claims in his lawsuit.

Even if the Court's statements constituted criticism, disapproval, or even hostility to Mr. Kemonou and his case, they would not be grounds for disqualification under *Liteky*, which held that a judge's critical, disapproving, or hostile statements regarding "counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge … [unless]

---

[1] Such theories are identified by the United States Holocaust Memorial Museum as some of the most prevalent anti-Semitic theories driving violence and discrimination against Jewish people throughout history. *See Antisemitism: An Introduction*, Holocaust Encyclopedia, https://encyclopedia.ushmm.org/content/en/article/antisemitism#antisemitic-scapegoating -and-conspiracy-theories-2 (last visited July 27, 2026).

they reveal an opinion that derives from an extrajudicial source … [or] they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). This high bar has not been met. The Court's observations were informed entirely by the statements made by Mr. Kemonou and provided to the Court in the record by Mr. Kemonou or counsel for the Department of Revenue, meaning the Court's opinion was not based upon an extrajudicial source. The Court also finds that its statements do not reflect a level of antagonism that would make fair judgment impossible. The Court is regularly asked to make observations about the merits of a case, and the ultimate merits of this case will not be decided by this Court but by a jury and by the District Judge assigned to this case, the Honorable Jerry W. Blackwell. This Court is charged with managing this litigation and addressing non-dispositive pre-trial issues, which often have very little, if anything, to do with the ultimate merits determination. The Court has sufficient confidence in its own self-control and commitment to its oath of office to be sure that it has and will continue to make decisions based on the facts and the law, not on its distaste for Plaintiff's views about Jews.

### B. Plaintiff's Allegations of Discrimination by the Court

Second, Mr. Kemonou claims that "if Plaintiff is antisemitic, then this judge is hateful, this court is racist[] and Islamophobic." (Pl.'s Mem. in Supp. 4, Dkt. No. 166.) He says that the Court characterized his statements and conduct as antisemitic, a characterization that Mr. Kemonou seems to claim is necessarily anti-Islamic. The only way the Court can understand Mr. Kemonou's claim is that Mr. Kemonou believes that Jews and Muslims are opposed to each other and that therefore criticism of anti-Jewish

5

bigotry is anti-Islamic. Mr. Kemonou is simply wrong. Opposition to bigotry of one kind is not bigotry of another kind in disguise. The Court said nothing about Mr. Kemonou's race or religion in the April 7 hearing, nor has it done so in any other hearing or written filing except to identify racial and religious discrimination as alleged bases for Mr. Kemonou's claims.

The Court has not once expressed any negative sentiment in court or out of court toward Mr. Kemonou at all, beyond its condemnation of Mr. Kemonou's anti-Jewish statements. Rather, Mr. Kemonou, even in his memorandum accusing the Court of Islamophobia, shows express disdain for Jewish people. (*See* Pl.'s Mem. Mem. in Supp. 4, Dkt. No. 166 (claiming that various parties, witnesses, and former defense counsel are "known members of the Jewish community")．) Mr. Kemonou seems to interpret the Court's decisions on the legal and factual merits of his arguments as being seated in what he perceives as "a negative personal view of him based partly on racial and religious assumptions." (*Id*. at 6.) While Mr. Kemonou is entitled to his opinion, that opinion is not entitled to any presumption of factual validity. The Court's decisions in this case have been based solely on the law and its application to the facts of the case. Those decisions have nothing to do with the race or religious identity of any party or party representative. That will continue.

The Court believes it has been exceedingly patient with Mr. Kemonou throughout this case and given him substantial leeway in pursuing his claims, even if those claims seem to be founded in nothing but his own perception and dubiously credible evidence. But there are limits to the Court's liberality and quoting Adolf Hitler with approval while

6

asking deposition witnesses whether they are Jewish and other discriminatory statements are beyond those limits. The Court will not allow Mr. Kemonou to use the judiciary as a platform for abusing others, whether that be witnesses or opposing counsel. Nor will the Court allow unfounded allegations of racial and religious bias to infect its decision-making, for either side of this case. Mr. Kemonou's perceptions of how this case has been managed are not supported by the facts in the record and are not grounds for the Court's disqualification.

### C.  Plaintiff's Perception that the Court Barred Him from being Heard

Mr. Kemonou's third claim is that the Court's comments condemning his anti-Jewish statements prevented him from "explaining the full extent of his post-termination harm." (Pl.'s Mem. in Supp. 7, Dkt. No. 166.) This is factually inaccurate, as shown in the April 7, 2026 hearing transcript. After the Court's condemnation of Mr. Kemonou's various anti-Jewish statements throughout the litigation, the following exchange took place:

THE COURT: … Mr. Kemonou, am I making myself clear?

THE PLAINTIFF: Yes, Mr. Judge. Can I … provide a short comment, Mr. Judge?

THE COURT: If it's something other than an apology, I don't want to hear it. Because what I'm saying is that you are not to spread this, and I think if you speak now, you're about to spread your political philosophy, … which you are allowed to do, which you have a constitutional right to do. But you don't have any kind of right to use this court to amplify those views.

THE PLAINTIFF: Mr. Judge, if I may, my comment will be about my suffering. And if I may, I can tell you a little bit about all the wrong I'm -- I'm going through right now. And what I'm trying to say is because -- is that

7

I'm going through -- I'm being stalked and harassed, and this is true. I mean, I'm not free. I can't move forward with my life. I've been stalked. I have moved eight times since I filed this lawsuit. I'm being stalked. I'm being harassed. There's nothing –

THE COURT: What does Adolf Hitler have to do with that?

THE PLAINTIFF: I have proof about the people behind the harassment I'm going through. And this is happening outside of the court, and I am seeking help. I call the police. I try to talk with the FBI. Nobody can do anything about it. I have to move eight time[s] because a group of people are trying to hurt … me outside of this case. I brought this case to this court to seek justice.

But a group of people powerful enough is -- I never share my location to anybody to find out my location, and they come and talk with my neighbor. They talk with my friend. They stalk me. I have to move eight times. … I can't have a life because I have to move every three months.

And I know the people behind this. I'm trying to tell them, "Stop. This is wrong." I'm ready to move on from this case, but these people are not moving. I'm being stalked, Mr. Judge, and this is true. I'm not making this up. I'm being harassed and stalked by these people.

These people are contacting my friends, my neighbors, my families, and they are spreading the same misinformation about me, and that's why I'm trying to fight this. I don't have mental health issue[s]. I'm being stalked by people. I'm being harassed, Mr. Judge, and this is true.

I can prove I move more than eight times -- every three month, I have to move because these people, they find a way to know my -- my next locations. And the next thing I see, I see -- I see them. I get in my car. I see these people stalking me. I go to a restaurant, I see these people go and start spreading this misinformation about me.

I know everything about what they are doing. I can't fight it, so this, the way I talk about this case, is -- is a reflection of what I'm going through. I'm being harassed and stalked by these people, and I believe these people are powerful, more powerful to hurt me outside of this case. So if this is [how] can stop this, that's good for me.

(Apr. 7, 2026 Hr'g Tr. 25:3–27:11, Dkt. No. 148.) It is absurd to argue that the Court "prevented Plaintiff from explaining the full extent of his post-termination harm" when the Court allowed Mr. Kemonou to go on for several minutes, repeating the same conspiracy theory the Court had just identified as meritless.

8

Further, the hearing at issue was on Defendants' Motion to Compel, not on the merits of Mr. Kemonou's claims, meaning that at no point in that hearing was the Court required or expected to provide Mr. Kemonou the opportunity to explain the harm he alleges in his compliant beyond what was relevant to the Defendants' argument that Mr. Kemonou was not complying with his discovery obligations. The claim that the Court did not give Mr. Kemonou the opportunity to be heard on his damages in this case is factually incorrect, and even if the record supported it, the claim would not support the Court's disqualification because the Court was not required to provide that opportunity in the hearing.

### D. Cumulative Effect of Above-Described Claims

Finally, Mr. Kemonou claims that all the above-discussed issues together satisfy Section 455(a)'s requirement that the Court disqualify itself where a reasonable person might reasonably question the Court's impartiality. Because the Court finds that none of Mr. Kemonou's other claims provide a factual or legal basis for disqualification, this claim also fails to support granting Mr. Kemonou's motion. That Mr. Kemonou believes that the Court is biased against him does not mean that a reasonable person would come to the same conclusion. Mr. Kemonou's claims are based on false equivalences, conjecture, and obvious misstatements of the record that do not accord with the reality of this case. Mr. Kemonou's self-serving descriptions of the proceedings at issue here are simply not accurate and reflect a fundamental misunderstanding of the law and its application to clearly documented facts in the record.

As the Court held previously, the Court finds no basis in law or fact for the Court to be disqualified from this matter. The Court's decisions in this matter, as in all matters, have been made by applying the law to the facts. That Mr. Kemonou is dissatisfied with those decisions is not grounds for disqualification, nor is the Court's admonition of Mr. Kemonou for his blatantly offensive remarks.

### III.    Conclusion

Accordingly, based on the foregoing and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT** Plaintiff's Motion for Disqualification of Magistrate Judge (Dkt. No. 164) is DENIED.

Date: July 30, 2026

*s/ John F. Docherty*
JOHN F. DOCHERTY
United States Magistrate Judge